STANLEY AND SHERLIN BEYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beyer v. Commissioner
Docket No. 3934-88
United States Tax Court
T.C. Memo 1993-313; 1993 Tax Ct. Memo LEXIS 320; 66 T.C.M. (CCH) 142; July 19, 1993, Filed *320 Decision will be entered for respondent. For petitioners: Bruce I. Hochman, William M. Weintraub, and Dennis L. Perez. For respondent: Richard H. Gannon, Charles O. Cobb, and Cathi L. Bernabo. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1983 in the amount of $ 428,287. The issue for decision is whether petitioners are entitled to a casualty loss deduction for the year 1983 in an amount in excess of the $ 66,293 cost of repairs made to their property and, if so, the amount of the loss to which petitioners are entitled. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Malibu, California, at the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1983 and an amended joint Federal income tax return for that year. Petitioners' home is located on four residential lots facing the ocean on Point Lechuza in Malibu, California. The legal description of these lots is Lots 2, 3, 4, and 5 of Track 25166 in the County of Los Angeles. Lots 3, 4, *321 and 5 were purchased by petitioners in October 1971 for $ 400,000. Lot 2 was purchased by petitioners in May 1978 for $ 220,000. Petitioners' residential lots make up an area commonly referred to as Lechuza Point which lies between two beaches, the Trancas and Encinal beaches. As of the end of 1979, prior to the construction of petitioners' residence, Lechuza Point was three-tiered. The lower tier was gently sloping beach sand followed by a relatively level terrace area containing a mixture of sand with some clay and sparse growth and the highest tier was irregularly level and consisted mainly of terrace deposits. When petitioners purchased their Lechuza Point property, the improvements on the property consisted of a leach field which was built by Los Angeles County to service 16 or 18 homes in the area as a sewer system. There was also a cement drain box connected with the sewer system and a riprap line of rocks that was partially exposed to protect or to define the leach field system. The primary portion of the beach and terrace area is on Lots 2 and 3, each of which has 50-foot ocean frontage, making a total of 100 feet. Lots 4 and 5 consist of a foreland atop a breccia *322 bluff that marks the terminus of Point Lechuza. Lot 4 has a point that juts out into the ocean. The total ocean frontage of Lot 4 is over 156 feet, counting the ocean frontage around the point that juts into the water. Lot 5 has an ocean frontage of approximately 119 feet. The depth from the ocean to Point Lechuza Drive, which is the access road to the property, ranges from a little over 247 feet on the west side, which is on Lot 2, to the shortest point of approximately 171 feet on the east side, which is the terminus of Lot 5. Point Lechuza Drive which is the access to the lots was formerly known as Roxanne Beach Road. The name was changed at the end of 1982. Petitioners first began to attempt to obtain permits for the construction of their residence in 1973. Petitioners obtained a permit to build their house in 3 or 4 months but 2 weeks before they were to break ground a law was passed in California creating the California Coastal Commission which immediately took jurisdiction over the area in which petitioners proposed to build their house. Petitioners could not proceed with the construction of their house pending examination and approval of their project by the newly *323 formed Coastal Commission. The Coastal Commission examined petitioners' construction project and held five public hearings on the project over a period of 7 years. On July 3, 1979, the Coastal Commission issued a final permit allowing construction of petitioners' residence and this permit was amended on June 1, 1981. Petitioners began construction of their home in September 1981. Petitioners' home was initially constructed on Lots 3 and 4 and there was additional construction on Lot 3 which continued until October 1983 and an addition was begun on Lot 5 in 1985. In January 1983 petitioners received a certificate of occupancy for the house and soon thereafter moved into their newly constructed home. The staff of the California Coastal Commission initially recommended denial of petitioners' application for a permit to build a house under the plans petitioners presented. However, after a hearing on April 24, 1978, the permit was granted, subject to the conditions that the plans for the home be changed so that the building would not extend beyond certain contour lines and that a lateral access easement over petitioners' property be provided to the public. The State wanted the *324 lateral access easement so that the public would not be excluded from picnicking, recreating, sunbathing, and swimming on the beach. In the Coastal Commission report dated March 18, 1978, the statement is made that: The Sea Level Drive - Lechuza Point area has been identified by Coastal Commission staff as a potential acquisition site. The area is well suited to public recreation due to the wide beach and the unusual Lechuza Point landform. The State Department of Parks and Recreation, however, does not have any plans to acquire this site for public recreation in the near future * * *
Petitioners agreed to the conditions set by the California Coastal Commission, including the contribution of the lateral access easement across their beach to the California Conservancy Board. In 1979 petitioners contributed the lateral access easement on Lots 3, 4, and 5, and in 1980 the easement was extended to Lot 2. The lateral access easement extends from the mean high tide line landward towards petitioners' residence. The easement provides for the public to pass and repass, view, picnic, and conduct other passive recreational activities within the easement boundaries. The easement *325 was irregular in shape and extended from the high tide line to the bluffs and riprap line. The easement extended to within about 5 feet of petitioners' home at certain points. On their 1979 Federal income tax return, petitioners claimed a charitable contribution deduction, before limitation, of $ 965,000 for the granting of the lateral access easement over Lots 3, 4, and 5 to the California Conservancy Board. On their 1980 Federal income tax return, petitioners claimed a charitable contribution deduction, before limitation, in the amount of $ 246,500 based upon the grant of a lateral access easement over Lot 2. The deduction claimed by petitioners in 1979 was based on an appraisal report prepared for petitioners by a Mr. Christy Petrofanis dated January 15, 1980. The report concluded that the value of Lots 3, 4, and 5 before the grant of the easement was $ 2,350,000 and after the grant was $ 1,385,000. Mr. Petrofanis attributed this decrease in value to the fact that the easement was granted in perpetuity, that it allowed the public to pass and repass, view, picnic, and enjoy other passive recreational activities within the prescribed area, that the easement came within 5 feet *326 of the proposed residence at certain points, and that petitioners would be responsible for maintenance of the easement area. The $ 246,500 charitable contribution deduction claimed in 1980 was also based on an appraisal by Mr. Petrofanis. The report of Mr. Petrofanis valuing the easement donated by petitioners on Lots 3, 4, and 5, dated January 15, 1980, contained a map showing the area of the easement on these lots. On the map, the easement on Lot 3 is shown as running to the riprap line and the total easement apparently includes all of the sand beach below the riprap line, although there is some sand beach shown on this lot on the other side of the riprap line which appears from the map to be about 40 feet deep. The total area shown as sand beach on Lot 3 on this map is approximately 130 feet, of which over 80 feet appears to be below the riprap line and is part of the easement. The sand beach area on Lot 3 is deeper than that on Lots 4 and 5. Lots 4 and 5 on the map show no sand anywhere above the easement line but show sea caves and tertiary breccia within the easement area. From viewing this map, which is stated to go to the mean high tide line, the sand beach area would *327 range from approximately 130 feet, of which approximately 40 feet would be above the riprap on Lot 3, down to under 40 feet in areas on Lots 4 and 5. The best sand beach area on petitioners' property was on Lots 2 and 3. Except for some areas above the riprap on Lots 2 and 3, the total sand beach was included in the easement. Mr. Petrofanis, in concluding that the $ 965,000 difference in the value of Lots 3, 4, and 5 before the granting of the easement and the value after the granting of the easement was the value of the deductible contribution, considered the beauty of the land involved, the small amount of land available of similar scenic qualities, and that buyers in the price range for which the property would sell would weigh any advantages that might accrue to them from the grant of the easement against the loss of their privacy, real or imagined. In his report Mr. Petrofanis referred to the "exploding" increase in market prices of property in southern California in general, but particularly in the coastal areas. The plans for petitioners' residence were drawn by a world-renowned architect who had studied under Frank Lloyd Wright. This architect was famous for building *328 one-of-a-kind houses throughout the world. Petitioners' house is approximately 7,000 square feet and is built on concrete and boulders. The approximately 40 boulders ranging from 2 to 20 tons each were engineered in place prior to the actual construction of the home. The house also has stainless steel railings and fixtures throughout, specially designed mariposa slate floors, triple insulation, a six zone heating and air conditioning system, granite counter tops, highest quality kitchen and bathroom fixtures and appliances, and top quality building materials throughout. Petitioners obtained a permit on June 2, 1982, for the construction of a pool, garden area, equipment room, changing room, and retaining walls on Lot 3. This construction was completed in October 1983. The construction of the addition to their home on Lot 5, which petitioners began in 1985, was completed in 1986. During the period from late January through March 1983, the Malibu coast was battered by a succession of extraordinary winter storms. These storms were extraordinary in their intensity and also in their erosional effect on the Malibu coastline. The 1983 winter storms were unusually devastating to *329 the coastline because of their convergence with exceptional high waves with an elevation of approximately 10 to 14 feet and as high as 16 to 17 feet and the occurrence of the storms during a series of low pressure storm surges which caused the sea level to rise. The storm surges were superimposed on extremely high spring tides and there were exceptionally high water levels linked to strong El Nino conditions. The highest water level in recorded history of tide gauges along the California coast was recorded on January 28, 1983, at the Santa Monica pier. Petitioners' house was not actually damaged by the storm. Although the foundation was exposed, petitioners were able to cure that problem before any damage was done. Petitioners filed an application for an emergency permit to cure the damage on February 8, 1983, and the Coastal Commission granted the permit on February 14, 1983. The application stated that the area that was to be repaired is under water a great deal of the time under normal conditions, and, in fact, is usually only exposed at low tide. It was stated that the repairs that would be necessary would not change the appearance of the area as the rocks were to be placed *330 in the cavities that were broken out by the waves and really only restore the area close to its original shape and appearance. The application further stated that the erosion is continuing right now and it is not a matter of another storm causing further damage, it is the daily tide that is causing damage at the moment. "In fact, since we spoke last week, a further cave-in occurred." The emergency permit that was issued allowed petitioners to not only fill in the cave areas with rocks, but also to construct two riprap seawalls on the eastern side of Lechuza Point. In 1983 petitioners had two riprap seawalls on the landward end of two small coves ending in sea caves in the bluffs on Lots 4 and 5. Petitioners also increased the height of the existing riprap line on Lots 2 and 3 and filled the area behind the riprap line with earth and sand. The filled-in area had the appearance of a beach, but it was difficult to see the ocean from the area because of the height of the riprap seawalls. This area was actually adjacent to the portion of the basement of petitioners' house where utilities such as the furnace were located. The cost to petitioners for filling the caves with rocks, *331 the construction of the riprap seawalls, increasing the existing riprap line, and the replacement of earth and sand behind the riprap line was $ 66,293. The only problem petitioners have experienced with their home since the emergency repairs made around the foundation after the storm is that there has, at times, been a problem with water seeping into the basement. At the time of the trial of this case in May 1992, petitioners were having someone look into locating what the problem was that caused the water to sometimes seep into the basement. The basement of petitioners' home is not an underground basement, but is hung in space up to the point where the rocks are located. It is an above-ground basement, but waves still smash into the caves on their property and water is still in those caves. After the storm, most of the sand on the beach on petitioners' property had been washed away and mainly rocks were left. There was not enough sand left on the beach of Lots 2, 3, and 4 to make the beach useable as a sand beach. Petitioners filled in some sand on the beach with bulldozers and some sand has come back on the beach naturally since the storm. Although the beach had recovered *332 somewhat after the storms of January to March 1983, at the time of the trial of this case, it had not returned to the condition it was prior to the storms. The backshore of the beach, as compared to the beach that existed prior to the 1983 storms, was lower by 3 to 4 feet overall, particularly around the bedrock knobs west of the site. Around the headlands the beach foreshore has been lowered between 2 and 3 feet depending on the precise location. On the east side of the headlands some bedrock blocks have fallen into the sea and the sea caves have widened in some places by as much as 1 foot. At the time of the trial of this case, the foreshore sloped at 10 to 12 degrees, which is much steeper than prior to 1983. Before the 1983 storms, the high tide would stop about 20 feet before the end of the easement. At high tide, at the time of the trial of this case, most of the easement part of the beach was below water level. At low tide there would be sand beach on the easement portion of the property. Although there has been throughout the years and still is a natural buildup of the beaches along the Malibu coast at certain times of the year, the volume of materials available from *333 contributing sources for such buildup has been curtailed in recent decades. The primary sources of sediment material for building up the beaches are the Ventura and Santa Clara rivers. These rivers have in the past few decades had 42 percent and 37 percent, respectively, of their contributing watersheds blocked by dams and therefore the volume of sand, the primary beach-forming material, has been reduced accordingly. Another major source of beach sediment, the sea cliffs along the coast west of Lechuza Point, has also diminished during the present century. This has been due first to railroad construction and later to highway construction which has reduced the volume of the rock debris reaching the cliff base for redistribution in part as beach material. A broad sandy beach offers protection to shore front properties from waves and storms, as well as offering the opportunity for recreational activities. Where beaches suffer progressive erosion or the effects of a storm which is not compensated for by post-storm replenishment, storm front protection is diminished. Prior to the 1983 storm the beach sand on the best part of the beach was 15 to 20 feet deep. Back of this was terraced *334 deposits of brown and orange-brown sand, silty sand, clear sand, and graveling sand, generally running 5 to 15 feet thick. The other materials in the area were bedrock, originally consisting of very hard grey-brown breccia and sandstone and some fill, which had been done to the property mainly adjacent to Point Lechuza Drive (but apparently not in other places), which was 2 to 5 feet deep. Fill material consisted of sand and clay-sand containing some organic debris with minor amounts of concrete and asphalt fragments in a loose condition. Coastal Malibu is approximately a 26-mile stretch of scenic California coastline, the westerly end of which abuts the Ventura County line, and is considered one of the most prestigious beach areas in southern California. The terrain in coastal Malibu may be classified into three categories: (1) Narrow stretches of beaches interspersed occasionally with rock outcropping, (2) raised marine terraces directly back of the beaches, and (3) the Santa Monica mountains which rise to majestic heights of more than 2,800 feet with canyons and draws that emanate from the mountains and end as watercourses near the sea. Problems such as geological or soil *335 problems, the rugged terrain, inadequate provision for water, and less than satisfactory sewage systems, as well as inadequate access from important urban areas, and high fire hazard, have been problems in the Malibu coastal area. Also the Malibu coastline has been troubled periodically with coastal storms that have caused extensive damage to the beaches and ocean front properties, especially when such storms coincided with particularly high tides. However, this property has remained a prestigious area because of the spectacular views of the coastline, which is especially true of the Lechuza Point area on which petitioners' house was located. The land around the point is utilized exclusively for single-family dwellings. Petitioners on their income tax return for the calendar year 1983 claimed a casualty loss, before limitation, because of the effects of the January through March storms on their property in the amount of $ 1,385,000. Subsequently, petitioners filed an amended return claiming a casualty loss, before limitation, in a total amount of $ 2,076,239 and they amended their petition in this case to claim the larger amount of casualty loss. Respondent in the notice of deficiency *336 disallowed all the claimed casualty loss except the $ 66,293 which petitioners spent to repair the caves and protect the foundation of the house and increase the riprap line of the property. Respondent's explanation was that petitioners had failed to substantiate that any deductible loss was sustained as claimed on the return. The $ 66,293 expenditure, which respondent does not question being a casualty loss, is not deductible because of the income limitations on deductibility of casualty losses in 1983. OPINION Although the record shows that storms of various types were relatively common along the Malibu coastline where petitioners' property is located, respondent does not take issue with petitioners' position that the January through March 1983 storms were so severe as to constitute a casualty and that petitioners are entitled to a casualty loss deduction to the extent of the loss in value of their property, if any, due to the casualty. Respondent's position is that the total amount of the casualty loss is $ 66,293, the expenditure to restore the damage done to the rock and cave area around petitioners' house and to increase the height of the riprap wall. Respondent argues *337 that these repairs restored petitioners' property to its precasualty condition and that petitioner suffered no further damage from the casualty. Petitioners' position is that the loss of the sand beach on part of their property as a result of the storms caused a diminution in the value of their property far in excess of the damage to the property which was remedied by the work done in connection with replacing rocks to protect the foundation of their house and increasing the height of the riprap wall and replacing some sand. The record in this case is clear that the Malibu beach, as is the situation with most beaches, is not stable in ordinary weather. Generally, tides which come in the winter will wash away sand and tides which come in the summer will deposit sand building up the sand washed away. One of petitioners' witnesses, who has a Ph.D. in geography with a specialty in geomorphology from the University of Birmingham in England and at the time of the trial of this case was a professor of geography at the University of Southern California, has written a number of articles which were put in the record in this case discussing the deposits of sand and other type deposits on *338 the Malibu coastline and the washing away of those deposits. This professor also testified at the trial as to the natural building up of the beach through the action of winds and waves and the tides and the attrition of the beach from the same natural forces. Also, there is no disagreement between the parties that forces of nature have replaced a substantial part of the sand washed out by the 1983 storms. There was some disagreement as to the amount that the beach had recovered at the time of the trial of this case and as to whether in time the beach would fully recover. However, the main disagreement between the parties was whether the loss of the beach, to whatever extent it might be permanent, caused a decrease in the value of petitioners' property and, if so, the amount of such decrease. It has long been settled that the amount of a casualty loss is generally represented by the difference between the fair market value of the property to which the casualty occurred immediately before the casualty and its fair market value immediately thereafter but not exceeding the adjusted basis of the property. ; *339 . Also, many cases have recognized that a competent appraisal is one of the methods of proving the value of the property before and after the casualty but that the casualty may also be proved by the cost of repairs to put the property back into the condition it was before the casualty. However, if the work done on the property also includes capital improvements that in and of themselves add to the value of the property, the cost of such improvements is not a part of the casualty loss. We have recognized in at least two cases that storms which damage the beach frontages of land on which a home is located may be the basis of a casualty loss if the damage to the land reduces the fair market value of the entire property below its fair market value before the casualty. There have been a number of cases involving various types of damages to an individual's real property other than the building located on the property such as destruction of shrubbery or trees. However, our attention has been directed to and we have found only the two cases above-referred to involving the allowance of a casualty loss with *340 respect to damage to a beach. In , we pointed out that the regulations provide that in determining a casualty loss involving real property and improvements thereon not used in a trade or business or in a transaction entered into for profit, no separate basis needs to be apportioned to such improvements. We then stated -- we interpret this regulation to mean that the only basis limitation in this case is the stipulated $ 34,576.35 basis for the entire property, notwithstanding the fact that the only physical damage was to the land, the basis of which was $ 10,000. This is appropriate because the amount to be determined here is the reduction in the fair market value of the entire property, not just the fair market value of the land.
The record in this case shows that petitioners' initial basis in the land was only $ 620,000 and that petitioners had claimed in excess of the amount paid for the property in charitable deductions for contributions of an easement for public use. Therefore, it is important in this case that the appropriate measure of the casualty loss is the reduction in value, if any, *341 of the entire property. In , we pointed out that the loss involved was to approximately 55 feet of beach depth and a permanent protective and aesthetic berm which stretched across the property 5 feet high and 25 feet wide. Based on our acceptance of the testimony of an expert, we allowed a casualty loss of $ 23,000 because of the permanent destruction of a part of the beach on the taxpayer's property by the casualty. The other case we found dealing with a casualty loss to waterfront property where only the land was harmed is . That case also involved a lake shore lot which was damaged by a storm. In that case we found that the taxpayers' beach and lower tableland were washed away by the storm and that the damage was permanent. We then proceeded to determine the difference in the fair market value of the property before and after the casualty and again, based on an expert's testimony, determined that the taxpayer had sustained a $ 46,050 loss from the casualty. The instant case is a more difficult one since it involves ocean frontage. Both parties *342 and all experts agree that beaches erode and are built up naturally and that there has been a substantial amount of buildup of petitioners' beach since the 1983 storms, although at the time of the trial of this case the beach was not to the level that it was prior to the storms. Although there is some factual disagreement between the experts as to the extent the beach may be expected to be rebuilt in coming years by forces of nature, we accept the testimony in this regard of the professor of geography. This witness had done substantial work as to the effects of tides on beaches and specifically with respect to the Malibu area. His opinion was that although there was recovery of the beach and might be further recovery, he did not believe there would be full recovery of petitioners' beach to the prestorm level in the foreseeable future. While this leaves open whether eventually the beach will rebuild to the point where it was before the storm, in our view accepting that it will not fully rebuild in the foreseeable future, is equivalent to a conclusion that some permanent damage was done to the beach by the storm. We now come to the far more difficult question of whether the damage *343 caused to the beach in front of petitioners' house by the storm reduced the fair market value of the property and, if so, to what extent. Petitioners offered the testimony of an expert who computed a fair market value of petitioners' property before the storm and after the storm. This expert computed separately the value of the residence and the value of the land. Using sales of various lots for a period of time ranging from September 1980 through August 1983 that had beach frontage ranging from 38 feet to a bluff lot of 238 feet, petitioners' expert concluded that the before value of petitioners' Lots 2 and 3 was $ 22,000 per front foot or $ 1,100,000 each; that the per foot value of Lot 4 before the storm was $ 8,654 per front foot of 156 feet, making a total of $ 1,350,024; and that Lot 5, with a front footage of 119 feet, had a value of $ 9,874 per front foot or $ 1,175,000, for a total land value of $ 4,725,000. Petitioners' expert further concluded that the two properties most appropriate to use in comparison for before-the-storm sales had sales prices of $ 13,636 and $ 28,750 per front foot respectively. The lower of the two was from a sale in 1980 of a 66-front foot *344 unimproved lot. The other sale was of an improved property. The range petitioners' expert chose to take for the after-the-storm value showed front footage sales prices of from $ 3,992 to $ 23,641 some improved and some unimproved. There is no showing in the record whether there was any storm damage to any of the lots petitioners chose to consider as comparable. So far as this record shows there may have been no damage whatsoever to any of the lots petitioners' expert considered as comparable after the storm, including the two he considered most comparable. There is also no satisfactory explanation by petitioners' expert of why one would compute a decrease in value by including unimproved property to apply to a property improved with a substantial house. Petitioners' expert determined the value of the improvements on petitioners' property by using what he stated to be the costs to February 6, 1984, incurred in connection with building the house. To actual construction costs which he determined to be $ 3,845,340, petitioners' expert added architectural fees of $ 403,611, landscaping of $ 50,000, construction financing from September 1, 1980, to December 31, 1983, of $ 673,813, *345 loan points at 3 points on $ 4,850,000 of $ 145,500, property taxes during construction from September 1, 1980, to December 31, 1983, $ 58,108, making a total cost of $ 5,176,372. Petitioners' expert arrived at a before market value of the property by adding his computed land value of $ 4,725,000 to his computed cost of the house, making a total before-the-storm value of the property of $ 9,750,000. Using the 20 percent less which this expert computed for the after-the-storm value applied to the $ 9,750,000 computed value of the improved property, he arrived at an after-the-storm value of $ 7,740,000 for the improved property or a difference of $ 2,010,000, to which he added the $ 66,239 of repairs to arrive at what he considered the casualty loss. To attempt to support his result petitioners' expert relied on a sale on March 23, 1983, of an improved property with 57.66 ocean front feet which property sold for $ 1,550,000 or at $ 26,882 a front foot. In his report petitioners' expert stated that this property prior to the storm was in escrow for $ 2,000,000 and that it fell out of escrow because of the storm and sold for $ 450,000 less after the storm or a diminution of value *346 of 22.5 percent. However, when petitioners' expert was questioned about this property at the trial, he stated that the house on the property had been substantially damaged by the storm. The house on the property was a three-story contemporary residence which had been built in 1981 and contained approximately 4,105 square feet. The expert pointed out that he was aware of the extensive damage done to the building by the storm but gave no satisfactory explanation of why he would assume that the drop in value, if in fact there was a drop, was because the storm had occurred, rather than because of the substantial damage to the house. It may be that the amount paid for the property plus the cost of repairing the house would exceed the claimed $ 2,000,000 original escrow. Furthermore, there is nothing in the record to show to what extent, if any, the beach in front of this house had been damaged by the storm. Based on the testimony of petitioners' own expert, we consider the far more logical conclusion to be that the $ 450,000 reduction in price, if in fact there was such a reduction, represented the costs to repair the building, rather than a reduction in value because of the storm. *347 Therefore, the value of this property is no support for the conclusion the expert made of a reduction of 20 percent in value of coastal property because of the storm. Since the $ 26,882 per front foot includes dividing the front footage into the price paid for the land and the building, this figure is also a meaningless comparison. If in fact the $ 26,882 is multiplied by the 375 feet ocean front footage of petitioners' property, the result is $ 10,080,750 which is more than the before-the-storm value of the property computed by petitioners' expert. Other than the so-called comparative sales, which have not been shown to be comparable, this transaction is the primary reliance of petitioners' expert. In our view it is inappropriate to use a computed reduction in values by considering unimproved land as well as improved land before and after the storm to apply to an improved property. Also, the comparatives selected by petitioners' expert do not support the amount arrived at as the before value of petitioners' property, since petitioners' property had a reduced value because of the easement on it and there is no showing that any of these other properties had a similar easement. *348 Furthermore, petitioners used construction costs to completion of the house in February 1984, which of course was a period that extended after the date of the storms in January through March 1983 and made no showing that the construction costs of a house constructed in the manner of this house would represent what a willing buyer would pay a willing seller for the property. Without suggesting that we accept the method used by petitioners' expert to compute the before-the-casualty land value, it would appear that at a minimum the amount should be reduced by the value of the easement. Petitioners' expert said something to the general effect that the fact that the public had an easement did not mean petitioners could not also use the property. However, this same expert had prepared an appraisal which concluded that the value of the property was reduced over 41 percent by the granting of the easement. If the land value as computed by petitioners' expert was reduced by 41 percent, it would amount to almost $ 2,000,000 which is close to the amount petitioners' expert figured as the amount of the reduction in the value of petitioners' property by the casualty. Without going into further *349 detail we conclude that the testimony of petitioners' expert failed to show what, if any, reduction in value petitioners' property sustained other than the $ 66,293 of repairs because of the storms in January through March 1983. The petitioners' expert geographer testified with respect to the situation of the beach and the advantages of a beach in protecting property as well as its aesthetic value, but gave no financial estimate of an amount of casualty loss. Petitioner himself when asked had the loss of this beach impacted the value of his property, answered, "well, I don't know, I wouldn't actually know absolutely for sure until I went to sell it but, in my view, because a beach house that doesn't have a beach is not very desirable in my view". However, the record shows that petitioner continued to improve the property well after the storm, adding to it as late as 1985 with the addition not being finished until 1986. Petitioner also at other parts of his testimony pointed out that this was not a beach house in the sense of a second home, but was his permanent and only residence. Also, petitioner testified that he had brought in some sand for the beach after the storm. He did *350 not explain why, if he felt the condition of a beach would adversely affect his property to any appreciable extent, he did not make further attempts to reconstruct the beach by bringing in more sand or placing jettys at strategic points. Also, petitioners' beach loss to a large extent was temporary. Photographs placed in evidence do show a beach after the storms. Also, the testimony clearly shows that this beach is actually used. When shown certain pictures taken of the beach shortly before the trial, one of petitioners' experts pointed to certain footprints to make the point that the nature of the prints lead him to believe that the sand where they were made was wet. In fact, almost every picture introduced of the beach both before and after the storm had footprints on the beach showing that there was use of the beach. Respondent offered the testimony of an expert who primarily based his opinion on the price received for the same properties which had sold before and after the storms. The problem with most of the sales of the same properties before and after the time of the storms as shown in respondent's expert's report is that there is too long a time period between the sales. *351 For instance, the first sale of one of the properties was in January 1979 and the second sale in May 1987, an 8-year difference. A difference of this time would take away any value with respect to a conclusion as to whether there was a reduction in value of the property because of the storm. There were some sales that supported the position taken by respondent's expert. There was a sale of property at 31202 Broad Beach Road in July 1981 for $ 933,500 and the same property sold again in September 1983 for $ 1,360,000. Absent there having been improvements made to the property, these dates are close enough to give some indication that the storm did not reduce the value of this property. Also, this property is located near petitioners' property. However, as in the case of petitioners' expert's comparatives, there is no showing of whether there had been improvements to the property between the time of the two sales or whether there had been any damage to the beach in front of the property by the storm. About the most that can be said from the numerous comparatives used by respondent's expert is that the property in the Malibu beach area was steadily increasing in value from 1980 *352 through 1991. This is not an indication of whether there would be some loss in value of the property on account of beach damage. Actually there could be a substantial loss in value to a piece of property on a permanent basis from the storm, but with the general market conditions of property increasing in price, a number of years later the property might sell for more than its value before the casualty occurred. For this reason also many of the comparatives used by respondent's expert are of no help in resolving the issue in this case. While it is reasonable to assume that the loss of some of the beach on petitioners' property may have had some adverse affect on its value, this fact is by no means self-proving. Ocean front property by its nature is unusual as the testimony in this record shows. According to petitioners' own computation, petitioners would be entitled to no deduction for a casualty unless that loss exceeded $ 321,000 because of the required reduction of the casualty loss by 10 percent of petitioners' adjusted gross income. Based on this record, petitioners have failed to show a casualty loss or the amount of casualty loss, if any, they sustained in excess of the *353 $ 66,293 repair cost. Certainly petitioners have failed to show that any casualty loss because of damage to their beach would exceed the $ 321,000 less $ 66,293 necessary for them to be entitled to a deduction for a casualty loss. Decision will be entered for respondent.